## MORRIS *vs.* TINKER.

[This case was argued at the tast term and decision reserved.]

1. Under section 888 of the Code, the sheriff has no authority to levy a tax execution, when the principal amount does not exceed fifty dollars. A levy by an officer who has no authority, is the same as no levy. A sale without a legal levy, is the same as no sale.

2. When title papers are void, and, on the facts, not even relevant as color of title, they should be rejected as evidence.

3. When the premises in dispute is a mill-site having a steam saw-mill thereon, the mesne profits may embrace the rent of the mill and of the site as one establishment. The whole may be treated as realty, for the purpose of estimating the plaintiff's damages.

4. The jury may decline to reduce mesne profits, on account of improvements, where the evidence satisfies them that the improvements are not lasting, but must perish before the plaintiff can reap benefit therefrom.

Ejectment. Tax. Levy and sale. Evidence. Mesne profits. Before Judge TOMPKINS. McIntosh Superior Court. November Term, 1876.

This was an action of ejectment by William C. Tinker against Richard L. Morris and Charles H. Steadwell, for a certain island of about sixteen acres, called Big Myhall, lying in the waters of the Altamaha river, with the adjoining marshes and the appurtenances, including a count for mesne profits. The action was commenced October 23d, 1872. The defendant, Steadwell, did not appear or plead. The defendant, Morris, pleaded as follows:

1st. The general issue.

2d. That he was a *bona fide* purchaser, and being in the possession *bona fide* and under a claim of right, he, from time to time, put valuable improvements upon the land, of great value, to wit: of the value of $5,000; which value he proposed to set off against the plaintiff's claim for mesne profits.

3d. An equitable plea, in which, alleging the same facts as in his second plea, he claimed compensation for the value of his improvements in the event of a recovery against him.

The plaintiff introduced the following evidence :

1st. A deed from John M. McIntosh to Bradford T. Chapman, dated April 10th, 1855, conveying the land in dispute.

2d. A deed from the same Chapman to the plaintiff, dated April 23d, 1860, conveying the land in dispute.

3d. The parol testimony of William C. Tinker, who testified as follows :

I am the person to whom the land was conveyed by Chapman. I was in possession of it from that time until September, 1870, when I went away, leaving my family residing on the land. I returned in June, 1871, and found my family removed, and Steadwell in possession. I do not know how this came about. I understood that Steadwell and Morris were in possession as partners. There were on the island when I left a steam saw-mill and several houses. The yearly value of the land and houses, with the saw-mill, was about $1,500.00. (The defendant objected to the admission of any statements by the witness about the saw-mill as irrelevant, the saw-mill not being involved in the controversy ; but the objection was overruled.)

On cross-examination, the witness said :

The yearly value of the mill alone was $1,500.00. The dwelling-house was worth, to live in, $50.00 per annum. Before I left, the saw-mill was sold under a mortgage *fi. fa.* in favor of Richard Cogdell. I was present at the commencement of the sale, and heard that it was bought by Richard Cogdell, junior ; but I never considered or recognized the sale as good, and I remained in possession.

The plaintiff here closed, and the defendant offered in evidence the following documents :

1. An execution for state taxes for the year 1870 amounting to $12.52, issued by the tax collector for McIntosh county, dated September 30, 1870, against Wm. C. Tinker.

2. An execution for county taxes for the same year amounting to $23.85, of the same date, and issued by the same tax collector against Wm. C. Tinker.

(On each of these executions was an indorsement by the

sheriff of McIntosh county, dated September 30, 1870, stating that he had levied it on Myhall Island and mill as the property of Tinker.)

3. A deed dated November 1, 1870, from the same sheriff to one Wing, reciting that on October 1, 1870, he had levied an execution for taxes against Tinker on Myhall Island, and on a steam saw-mill located on said island, and that after lawful advertisement, etc., he had sold the property levied on, on the sale-day in November, 1870, and that the same had been bought by Wing, and proceeding to convey the same in the usual form.

(This deed did not recite that the sale was at the door of the court-house, or between the usual hours of sale; nor did it identify the tax execution under which it was sold further than as above stated.)

4. A conveyance from Wing to the defendant, Morris, written on the back of the foregoing deed, of the property described in it, dated May 30, 1871.

These papers being offered together, objection was made by the plaintiff to the executions and to the sheriff's deed to Wing. The court sustained the objection to the documents as evidence of title, but admitted all the papers offered for what they were worth as evidence, that Morris was a *bona fide* purchaser.

The defendant offered a witness to prove that the sale mentioned in the sheriff's deed to Wing did in fact take place at the door of the court-house, and between the usual hours of sale, but the court refused to admit the evidence.

The following witnesses were then sworn, and testified as follows:

1. James S. Dunwody:

I know the land. It was worth by the year, without the saw-mill and machinery, and without the improvements and repairs put upon it by Morris, $10 per acre. Those improvements and repairs consisted of wharves, an enlarge-

ment of the basin for timber, a dam for the basin, a wall, dwelling, office, etc. The increase in the value of the whole property resulting from these improvements is from $4,000 to $5,000. The yearly value of the whole, *with* the saw-mill and machinery, is from $800 to $1,000.

On cross-examination he said:

For a mill-site, it is not worth over $10 per acre, yearly. It is worth that for planting. I was employed there in 1872. A large part of the improvements, etc., have been put there since 1872—such as the digging out of the basin and the present wharf. As to the others, I do not know when they were put there, nor what any of them cost.

Being re-examined, he said:

The market value of the property in November, 1870, without the mill and machinery, was from $1,000 to $1,200. It is worth now, without the mill and machinery, $6,000. It is not worth more than $1,000 to $1,200 as a mill-site.

2. Richard L. Morris, the defendant:

I went into possession under my purchase from Wing the last of May or 1st of June, 1871. The value of the property then, not including the mill and machinery, but including all buildings, etc., was about $1,500. I have constructed a new wharf, enlarged the basin to double its former size and dug it out, repaired the dam of the basin, put up a slab-pit wall, and a new building for an office and store-house with two chimneys. The market value of the property, thus improved, is $6,000 at this time. The land, without the mill, when I got it, had no yearly value. All the yearly value it has results from my improvements, except what the place had of itself for purposes not connected with those improvements, or as a mere site. Besides the improvements and repairs already mentioned, I put a new foundation under the mill-building, and repaired other buildings.

On cross-examination, he said:

I gave $2,500 for the land, mill and all. I have not lost, but rather made money by the mill. The wharf was worth

nothing when I bought it; it was very much decayed, and could not be fully used, though I did use it as far as possible. It had to be repaired. But I have since rebuilt it anew. I cannot tell how much the improvements and repairs cost. They have not all been made since the commencement of this suit; some have, I do not remember precisely which. I commenced to repair and improve from the time I went into possession. The land without the wharf, is worth as a mill-site, to a man with a mill to put on it, from $300 to $400 yearly. The wharf is indispensable to the use of the mill.

Defendant also offered in evidence the following documents, viz: A sheriff's deed to one Richard Cogdell, junior, dated in March, 1870, reciting the sale of a steam saw-mill, etc., located on Big Myhall Island, as the property of Tinker, under a mortgage execution; and a conveyance of the said mill, etc., from Cogdell, junior, to Morris, dated May 30th, 1871. But the plaintiff objected to this evidence on the ground of irrelevancy, and the defendant withdrew it.

The defendant here closed, and the plaintiff recalled Tinker in rebuttal. who said:

I ran the mill till September, 1870, when I went north to get money to continue it. The place was used as a mill-site when I left. There was a wharf there then. As a mill-site, with the houses but without machinery and mill, the place was worth $2,000. I don't know what improvements have been made by Morris. The basin has to be cleaned out every year, and the wharf repaired every year or two. The materials of a wharf will not last more than two years; they have to be constantly repaired and renewed to be used. The basins have to be cleaned out two or three times a year to make them of use. This is indispensable to the use of the mill. Digging out basins and making and repairing wharves at this mill do not improve the property in any permanent way. Whoever uses the mill must repair and keep up the wharves, and keep the basins dug out for the use of the mill.

The court referred to the jury the following questions of fact, viz. :

1. What amount of mesne profits should be allowed to the plaintiff?

2. What amount of improvements was put upon the land by the defendant, Morris, he being in possession *bon-x fide* and under a claim of right?

In response to the first of these questions, the jury found the sum of $3,791. To the second they said : "No improvements have been made except for the benefit of the defendant." And the formal verdict found for plaintiff the land in dispute, and $3,791 as mesne profits.

The defendant moved for a new trial on the following grounds, viz. :

1. Because the court rejected as evidence of title the tax executions and entries thereon, the sheriff's deed to Wing, and Wing's deed to Morris.

2. Because the court refused to admit the testimony of a witness, offered by the defendant to prove that the sale mentioned in the sheriff's deed to Wing took place at the court-house door between the legal hours of sale.

3. Because the court charged the jury that in estimating the mesne profits, they ought to include the profits derived from the mill and machinery, as well as those derived from the land *without* the mill and machinery.

4. Because the court refused to charge the jury, as requested by the defendant, that a saw-mill, machinery, etc., are personal property, and that those mentioned in this testimony are not involved in the suit, but only the land and "things permanently attached to the same."

5. Because the verdict was without evidence to justify it.

The court refused the new trial upon each and every ground taken in the motion; and the defendant excepted.

JACKSON, LAWTON & BASINGER ; W. R. GIGNILLIAT, for plaintiff in error.

RUFUS E. LESTER, for defendant.

BLECKLEY, Judge.

1. The Code declares (section 888) that when the principal amount of a tax execution does not exceed fifty dollars, "the levy   *   *   must be made by a constable, and not otherwise." The act of February 25, 1876, (pamph. p. 30), changes this provision, but the act is subsequent to the levy and sale now under consideration, and therefore cannot be invoked here. The sheriff was empowered to sell land after levy and return by a constable, but could not make the levy himself unless the execution exceeded fifty dollars in amount. This was the law; and a levy made by the sheriff contrary to its express provisions, was nothing. A sale resting on such a levy has no validity.

2. The sale being a nullity, the sheriff's deed was utterly void. It was irrelevant as color of title, for it was too young. Upon its face, it showed there could be no prescription under it, the legal prescriptive period being longer than the interval between the date of the deed and the commencement of action.

3. The mill-site and the mill thereon could have been rented or leased by one and the same contract, and the whole sum would have been collectible as rent. 39 *Ga.*, 18, 19. Whatever would be rent as between landlord and tenant, is *mesne* profits as between the parties in ejectment: Though the mill and the land may have been separable without injury to either, still, while they were in fact together, and used, or capable of being used in the ordinary way, they were worth so much for rent. It is proper, and accords with usage, we think, to speak of the rent of a mill, the rent of a factory, etc., and in so doing, the use of the machinery, fixed or unfixed, is not thought of as excluded, but as included. The exact point made by counsel, however, is, that the declaration does not mention the mill, but describes the land only. There is plausibility in the objection, but not much positive force. With reference to rent or *mesne* profits, the whole is to be taken as realty, and a

suit for the profits of the land, applies to the land in its actual condition. In an action by a landlord against his tenant for rent, there could, we think, be a recovery for the entire rent, under such a description of the premises as this declaration contains. This being so, the description seems to us sufficient. When a mill-site has a mill upon it, attached to the earth in the usual way, and a trespasser takes possession of the site and uses the mill as it stands, he cannot insist on a separate valuation of the site and the mill, in accounting for *mesne* profits. He is chargeable with the value of the premises for rent, as a whole, and a description of the land with sufficient certainty to identify the premises, will include all parts of the premises.

4. According to the evidence, the improvements which were urged as a set-off against *mesne* profits were, for the most part, temporary in their nature. They were perishable, and the jury could well believe that they had perished, or were likely to do so before the owner of the premises could reap any benefit from them. Though they cost a considerable sum, and for a time enhanced the value of the property, there was good reason for disallowing them as matter of set-off. Owing to the destructive influences to which they were exposed, they had to be renewed periodically.

Judgment affirmed.